18791.   COX *et al. v.* GENERAL ELECTRIC COMPANY.

ARGUED NOVEMBER 9, 1954—DECIDED JANUARY 10, 1955.

*Cohen, Roberts & Kohler,* for plaintiffs in error.

*C. Baxter Jones, Jr., Sutherland, Asbill & Brennan,* contra.

*Powell, Goldstein, Frazer & Murphy, F. M. Bird, Charles J. Bloch, John H. Boman, Jr., A. G. Cleveland, Jr., William H. Schroder, Jr., Henry B. Troutman, Jr., Spalding, Sibley, Troutman & Kelley, James M. Sibley, Robert B. Troutman, Herman T. Van Mell, Eugene Cook, Attorney-General, Robert H. Hall, Assistant Attorney-General, Rogers, Hoge & Hills, George M. Chapman,* for parties at interest not parties to record.

WYATT, Presiding Justice. ■ It is contended that the plaintiff in the court below (the defendant in error here) is entitled to the relief sought in so far as counts one and two are concerned irrespective of the Fair Trade Statute for the reason as contended, that the petition seeks to protect property rights, and that the petitioner is entitled to have these property rights protected irrespective of the Fair Trade Act. This contention can not be sustained. The Supreme Court of the United States in Kiefer-Stewart Co. *v.* Joseph E. Seagram & Sons, 340 U. S. 211, (71 Sup. Ct. 259, 95 L. ed. 219), in dealing with a scheme similar to the one here involved, and certainly controlled by the same legal principles, said: "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*"

In Dr. Miles Medical Co. *v.* John D. Park & Sons Co., 220 U. S. 373 (31 Sup. Ct. 376, 55 L. ed. 502), where the scheme under consideration was essentially the same as the one here under consideration, and where the contentions of the medical company were in general the same as those alleged in the petition in the instant case, the Supreme Court of the United States said (at p. 399): "The bill asserts complainant's 'right to maintain and preserve the aforesaid system and method of contracts and sales adopted and established by it.' It is, as we have seen, a system

of interlocking restrictions by which the complainant seeks to control not merely the prices at which its agents may sell its products, but the prices for all sales by all dealers at wholesale or retail, whether purchasers or sub-purchasers, and thus to fix the amount which the consumer shall pay, eliminating all competition. . . That these agreements restrain trade is obvious." The court then held the scheme under consideration to be in violation of the Sherman Act.

In the instant case the plaintiffs in error are non-signers, or parties with whom the manufacturer has no contract. Clearly the above rulings as to the violation of the Sherman Act by schemes such as the petition discloses in this case are controlling.

The defendant in error further contends that it is entitled to the relief sought by virtue of a valid act of the General Assembly of the State of Georgia, the so-called "Fair Trade Act." In view of the above rulings of the Supreme Court of the United States, of course, if plaintiff in the court below is entitled to any relief, it must be by virtue of a valid act of the General Assembly of Georgia. This contention will be dealt with in the following division of the opinion.

■ Count three of the petition contends that the plaintiff in the court below is entitled to the relief sought by virtue of and under the provisions of the Georgia Fair Trade Act (Ga. L. 1953, Nov.-Dec. Sess., p. 549). As appears from the authorities cited in division one of this opinion, after the Supreme Court of the United States had declared schemes such as is here under consideration to be in violation of the Sherman Act (26 Stat. 209; 15 U. S. C. A., § 1), the Congress of the United States in the Miller-Tydings Act (50 Stat. 693, 15 U. S. C. A., § 1), attempted to delegate to the States the right to enact these Fair Trade Statutes. The Supreme Court of the United States in construing this act held that it could not be made to apply to persons who had signed no contract or agreement. Schwegmann Brothers v. Calvert Distillers Corporation, 341 U. S. 384 (71 Sup. Ct. 745, 95 L. ed. 1035). Thereafter, the Congress enacted the McGuire Act (66 Stat. 632, 15 U. S. C. A., § 45), attempting to delegate to the States the right to enact Fair Trade Statutes applicable to all dealers or retailers whether they had signed contracts or not.

This attempt by the Congress to delegate to the States this

power seems to be in the reverse of the power of delegation as we have always understood this subject under our system of government and under the provisions of the Constitution of the United States. However, that is the situation with which we have to deal.

The defendants in the court below had signed no contract or agreement of any kind. We are, therefore, not here concerned with what the situation would have been if there had been a contract between the parties because that question is not now before us. Clearly, it follows, if the scheme here under consideration is valid and if the plaintiff in the court below is entitled to the relief sought, it must be by reason of a valid law of Georgia making legal the scheme of doing business described in the petition under consideration. That the legislature attempted to make legal the scheme and method of doing business described in the petition, is clear from a reading of the act of 1953, supra. The question remains, however, is this law a valid law?

This court has very recently in two cases dealt with the question of fixing prices by statute. In *Harris* v. *Duncan,* 208 *Ga.* 561 (67 S. E. 2d 692), this court was dealing with a statute purporting to give to a board the right to fix the price of milk. We there said (p. 563): "Before the General Assembly can authorize price fixing without violating the due process clause of our Constitution, among other requirements, it must be done in a business or where property involved is 'affected with a public interest,' and the milk industry does not come within that scope." Certainly, if milk is not "affected with a public interest," electrical appliances are not.

Again in the *Harris* case, supra, we said (p. 564): "The right to contract and for the seller and purchaser to agree upon a price is a property right protected by the due process clause of our Constitution, and unless it is a business 'affected with a public interest' the General Assembly is without authority to abridge that right."

In the *Harris* case, supra, Chief Justice Duckworth wrote a very full and complete special concurring opinion. All that is said there by the Chief Justice is applicable here. We therefore, without the necessity of copying in this opinion what is there said, adopt that special concurring opinion as a part of this opin-

ion. It is contended that the *Harris* case, supra, differs from the instant case for the reason that the court was there dealing with the power of the General Assembly to authorize a board to fix prices, while here the court is dealing with an attempt by the legislature to authorize an individual to fix the price of its own product. The clear answer to this contention is that, if the General Assembly can not authorize a board created by the State to fix prices, certainly it can not give this right to an individual.

In *Grayson-Robinson Stores, Inc.* v. *Oneida, Ltd.*, 209 *Ga.* 613 (75 S. E. 2d 161), this court was dealing with a situation almost identical with that now under consideration, and there this court said (p. 619): "Moreover, and for the reasons stated in *Harris* v. *Duncan*, 208 *Ga.* 561 (67 S. E. 2d 692), Georgia's Fair Trade Act of 1937 offends article I, section I, paragraph III of our Constitution of 1945, which provides that 'No person shall be deprived of life, liberty, or property except by due process of law.' Code (Ann.) § 2-103. And for that reason the act is null and void." It is contended that this ruling was obiter dictum for the reason that the case had already been disposed of on the theory that the act violated the provisions of the Sherman Act. We do not agree with this contenton. However, to remove any doubt in the future, and since the language is so applicable to the act of the General Assembly now under consideration, we adopt that language as a part of this opinion as applied to the subsequently enacted Fair Trade Act now under consideration. It is argued that the Fair Trade Act of 1953, supra, is not a price-fixing statute, but is a statute enacted for the purpose of protecting the property right of the manufacturer in his trade name and trademark, and that the price-fixing feature is simply incidental. We can not agree with this argument. A mere reading of the act discloses that the purpose of the act is to authorize a manufacturer to regulate and fix the price of its product down through the channels of trade to the ultimate consumer and into the hands of persons with whom he has no contractual relation. If the price-fixing provisions are stricken from the act, the act is destroyed. Surely a provision so vital is not merely incidental.

It is further argued that this court is bound to sustain the validity of the act because of certain findings of fact by the General Assembly. We do not think that the recitals contained in

the act amount to findings of fact, but are simply arguments presented by the General Assembly as to the reasons why they considered the act necessary, and their conclusions as to the effect of the act. We are convinced that any findings of fact in conflict with what has been held in this opinion would be an attempt by the General Assembly to find a fact that does not exist, and, of course, no court is bound by that sort of finding of fact by a legislative body. Of course, a manufacturer has a property right in his trade-mark and trade name, but that does not give to him the right and power to strike down the Constitution of this State and interfere with the freedom of the right to contract.

It is argued that this court can not hold the Georgia Fair Trade Act unconstitutional without questioning the motives of the legislature and imputing dishonesty to that body. We reject this fallacious argument in its entirety. We simply disagree with the General Assembly for the reasons pointed out in this opinion.

It is earnestly argued that a number of the supreme courts have upheld the validity of their Fair Trade Acts, which were almost, if not entirely, identical with the Georgia statute under consideration, and our attention is called to a number of decisions by the Supreme Court of the United States. We are aware of the fact that a number of the State supreme courts have upheld these acts, a number have not passed upon them, and others have held them invalid. We are also familiar with the conflicting decisions on this question by the Supreme Court of the United States, as pointed out in the special concurring opinion of Chief Justice Duckworth in *Harris* v. *Duncan,* supra. We are here, however, dealing with the statutes of this State and with the question of whether or not they violate the Constitution of the State of Georgia. What the courts of other States have decided is not controlling, and this is one of the few powers left to States to decide for themselves regardless of what the Supreme Court of the United States may or may not have decided. We are also familiar with the modern trend to allow the government to encroach more and more upon the individual liberties and freedoms. So far as we are concerned, we will not strike down the Constitution of our State for this purpose; neither will we follow the crowd. The scheme described in the

petition now under consideration permits a manufacturer, under the guise of protecting his property rights in a trade name and trade-mark, to control the price of his product down through the channels of trade into the hands of the ultimate consumer, and into the hands of persons with whom he has no contractual relation whatever. This statute clearly violates the provisions of the due-process clause of the Constitution of the State of Georgia.

From what has been said above, it follows, the judgment of the trial court was error.

*Judgment reversed. All the Justices concur, except Almand, J., who dissents.*

ALMAND, Justice, dissenting. Neither the case of *Harris* v. *Duncan*, 208 *Ga.* 561 (67 S. E. 2d 692), nor that of *Grayson-Robinson Stores, Inc.* v. *Oneida, Ltd.*, 209 *Ga.* 613 (75 S. E. 2d 161), is conclusive on the questions raised in the instant case. In the *Harris* case, we were not concerned with the question of the right of an individual to fix a minimum selling price of a commodity, but were dealing solely with the authority of the State in enacting a statute authorizing the State Milk Control Board to fix the selling price of milk as sold by individual distributors; and we held that such statute violated the due-process clause of the State Constitution. In the *Grayson-Robinson* case, we had before us the validity of the Fair Trade Act of 1937. That act was declared unconstitutional, as being contrary to and inconsistent with the provisions of the Sherman Antitrust Act as it existed at the time of the passage of the statute, and was void ab initio as offending the supremacy clause as well as the commerce clause of the Federal Constitution. In the third division of the opinion, citing *Harris* v. *Duncan*, it was held that the act was null and void as offending the due-process clause of the State Constitution. This latter ruling was unnecessary, for the reason that the court had already held the act to be void ab initio, and the statute having already been stricken by the mortal blow given in the first division of the opinion, and being "dead," was not subject to be again stricken by a second blow, even though the second blow might have been mortal. In addition to the foregoing reason, the *Grayson-Robinson* case is not controlling in the instant case, because we are now dealing with an entirely new fair trade statute containing provisions which

were not present in the former statute, and these new provisions compel us to re-examine the constitutional questions raised in the instant case by the defendant's demurrer.

The Fair Trade Act of 1937 contained no declaration of public policy as a basis for enactment of the statute. The caption of the Fair Trade Act of 1953 provides that the act has for one of its purposes "to declare the public policy of Georgia with respect to property rights, trade-marks, good will, and the right and freedom to contract, and to exercise the police power of the State of Georgia so as to forbid the conduct of business in such manner as to infringe the equal rights of others, and to protect the general public against practices which may have the effect, or be intended to have the effect, of defeating or lessening competition or encouraging monopoly, by authorizing contracts stipulating minimum resale prices on commodities bearing trade-marks, brands or names, and defining as unfair competition and making actionable knowingly and wilfully to advertise for sale, offer for sale, or sell such commodities at less than the minimum prices established or stipulated in or under the contracts authorized by this Act, whether the person so advertising for sale, offering for sale or selling is or not a party to such contracts."

Section 1 (F) of the act of 1953 provides: "Trade-marks, brands, or names of commodities, and the good will associated therewith constitute property entitled to the protection afforded by this Act." Section 1 (G) provides that "Wilfully and knowingly advertising for sale, offering for sale, or selling a competitive commodity bearing a trade-mark, brand or name of the producer or distributor thereof contrary to the provisions of this Act and contracts entered into pursuant thereto of which the seller of such commodity has knowledge constitutes a wrongful interference with the property rights of the parties to such contracts."

It is thus to be seen that the act of 1953 creates a property right in the manufacturer or distributor of a commodity, whereby, when the owner of the commodity makes a contract as to the minimum price at which the commodity is to be sold, it is a breach of such property right for any person to sell or offer to sell such a commodity at less than the price stipulated in the contract, whether he signed the contract or not. We know of

no provision in the Constitution that would prohibit the General Assembly from making valid such a contract between the producer or distributor as to the minimum price at which such commodity should be sold. A contract between a manufacturer and retailer against price-cutting unless the trade-mark or trade name was detached from the commodity sold would be valid at common law. Ingersoll *v.* Hahne, 89 N. J. Eq. 332 (108 Atl. 128). The question, then, comes down to this: whether or not the General Assembly can give to a producer or distributor a right of action against one not a party to a contract fixing a minimum price of sale, without violating the right of the non-signer to sell the commodity as his own, at a price he may determine, without violating the due-process clause of the Constitution, which protects his ownership and property and his right to make private contracts. The act of 1953 does not forbid one who buys a commodity which bears a trade-mark or brand of the producer or distributor from selling or disposing of the same, but simply says that, if one purchases for resale in the open market such commodity, with the trade name of the owner or producer thereon, knowing that such commodity has been originally sold under a contract or agreement that the original purchaser would not sell at less than the stipulated price, he, the non-signer, must remove the trade-mark, brand or name from the commodity. The act does not forbid him from selling his own property, but simply forbids his reselling the commodity with the trade-mark, brand, or name of the owner for less than the minimum price.

As was said in Old Dearborn Distributing Co. *v.* Seagram Distillers 'Corp., 299 U. S. 183, 193 (57 Sup. Ct. 139, 81 L. ed. 109, 106 A. L. R. 1476): "Appellants here acquired the commodity in question with full knowledge of the then-existing restriction in respect of price which the producer and wholesale dealer had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it, upon every principle of fair dealing, assent to the protective restriction, with consequent liability under § 2 of the law by which such acquisition was conditioned. . . The ownership of the good will, we

repeat, remains unchanged, notwithstanding the commodity has been parted with. Section 2 of the act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates 'unfair competition.' See Liberty Warehouse Co. v. Burley Tobacco Growers' Assn., 276 U. S. 71, 91-92, 96-97. There is nothing in the act to preclude the purchaser from removing the mark or brand from the commodity—thus separating the physical property, which he owns, from the good will, which is the property of another—and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end."

The Supreme Court of North Carolina, dealing with a similar fair trade statute, in discussing the question of whether there was an unreasonable restriction placed upon a dealer in the commodity, stated: "The restriction is not imposed after the acquisition of the property, and is not in derogation of an existing or established right. Under the statute it was a condition that had already attached to the property. It was known to the prospective purchaser, and he was under no obligation to assume it. Morally and legally he is presumed to have accepted the condition by his voluntary act of purchase. . . Such a restriction is not confiscatory unless it is unreasonable or contrary to the principles of the Constitution reasonably interpreted; and one who invokes the aid of the Constitution in this respect must show that he has a title free from condition, at least with respect to the supposed invasion." Ely Lilly & Co. v. Saunders, 216 N. C. 163, 176 (4 S. E. 2d 528).

The General Assembly, in the enactment of the 1953 Fair Trade Act, made the following declaration of public policy: "The public interest and general well being of the State of Georgia will best be served by the maintenance of resale prices of trademarked, branded or named commodities which are in free and open competition with commodities of the same general class";

and this statement is supported with a recitation of the grounds of this conclusion. From public records, of which we can take judicial notice (see appendix to Schwegmann Bros. *v.* Calvert Distillers Corp., 341 U. S. 384, 71 Sup. Ct. 745, 95 L. ed. 1035); U. S. House of Representatives, Publication No. 1292 (1952), No. 1437 (1952)), these conclusions are fully warranted. It is not for us to quesiton the wisdom or propriety of the legislature in creating a right of action in favor of a producer or distributor of a commodity bearing a trade-mark, name, or brand against one who knowingly sells such commodity at a price less than that fixed in a contract between the producer or distributor and the original purchaser. The defendant in the instant case being under no obligation to buy the commodity bearing a trade-mark, name or brand (he having acquired no right to sell the trade-mark, name or brand separate from the commodity), I cannot see how he can complain that his right to sell his *own* property, or to contract under the due-process clause of the Constitution, has been violated. His freedom to buy is unhampered. His freedom to sell is limited only by the requirement that he must not intentionally violate the contract rights of the owner of the trade-mark, name, or brand.

The act being valid, the third count of the petition clearly alleges a case which, as against the general demurrers, entitles the plaintiff to the equitable relief sought.