844

No. 12132.   March 16, 1938.
Adhered to on rehearing, March 28, 1938.

*W. K. Miller,* for plaintiff.   *Curry & Curry,* for defendant.

Hutcheson, Justice. G. W. Gibbs, resident of Columbia County, and L. O. Johnson, a resident of Richmond County, brought their petition against the Milk-Control Board of Georgia, alleging substantially as follows: Pursuant to the "milk-control act" approved March 30, 1937 (Ga. L. 1937, pp. 247 et seq.), the board designated Richmond County as a "milk-shed," and thereafter held an election provided for under the act, for the purpose of determining whether the act should be made applicable in such milk-shed. At the election so held on April 22, 1937 the vote was 24 for adoption and 48 against adoption of the act, and the board so declared the result. Plaintiffs are advised that the board, without any petition therefor, has advertised notice of another election to be held on September 13, 1937. The board is without any authority under the act to call another election after the first; under the act the first election was final and no other election can be had. The board threatens to put the act in force notwithstanding the rejection in the first election, and to control the milk business, including that of plaintiffs and others similarly situated. Plaintiffs are respectively a wholesale milk producer and a producer-distributor as defined in the act, and are both duly licensed milk producers in the milk-shed. Such action by the board will bring great confusion in the milk business and operate greatly to the disadvantage of plaintiffs and others similarly situated, increase the cost of milk

to consumers without any corresponding advantage to them, and deny to the plaintiffs and other operators the equal protection of the law, as the act exempts producers with six cows or less. The prayers were for injunction restraining holding of the election and enforcement of the act, and for general relief. By amendment plaintiffs allege that they are taxpayers in the milk-shed, and have paid taxes and license fees to carry on their milk business, and are so doing under rules and regulations of force in the county as promulgated by the Board of Health of the City of Augusta and Richmond County. Plaintiffs have arranged their business and its attendant expense in view of the unfavorable election held on April 22, 1937, and said board is now estopped to assert to the contrary and to seek to ignore and set aside its own final declaration of the results of that election. The action of the board has brought and will bring about great confusion and increased expense in the milk business, will subject citizens and taxpayers including petitioners to irreparable loss and damage and cause a multiplicity of suits. A great part of this confusion and damage has been brought about by the action of a named individual, a member of the board. Such individual is a large producer and distributor in the milkshed, and since the election of April 22, in order to increase the confusion, he has lowered the prices of milk to the loss and damage of plaintiffs, and is using his position on the board to bring about such confusion, and has persuaded the milk board to try to have another election in the milk-shed, contrary to the interest of plaintiffs. The board now seeks to create a milk-control fund under section 17 of the act, all at the expense of plaintiffs and other milk dealers, and by increased license fees, charges, fines, etc., none of which they have any legal power to impose in the milk-shed, all to the irreparable damage of plaintiffs. Plaintiffs attack the act as unconstitutional and void, in that it is not impartial and complete but arbitrary and unreasonable, and denies to the plaintiffs the equal protection of the law, contrary to art. 7, sec. 2, par. 1, and art. 1, sec. 1, par. 2, of the constitution of the State, and the fourteenth amendment of the constitution of the United States, because said act makes an arbitrary and unreasonable classification of the milk business, operates oppressively against plaintiffs and their property and business by making said act applicable to those who have more than six cows, which petitioners have, and inapplicable to all producers with less than six cows.

At interlocutory hearing the plaintiffs introduced an affidavit of W. R. McDonald, manager of the Farmer's Co-operative Creamery in Augusta, stating that in Atlanta the retail prices fixed by the board have been increased without resulting in any additional benefit; that the operation of the law furnishes no additional protection or safeguard in the way of health regulation, nor does it fix any butterfat standards that would increase the value of the product sold, and that as a result the sale of milk in Atlanta has been greatly curtailed to the hurt and damage of retail distributors, actually making it necessary to dump hundreds of gallons of surplus milk in the sewers; that such curtailment in consumption has caused greater confusion, and has resulted, by reason of the rules promulgated by the board, in actual violation of the statute. An affidavit by J. W. McDonald and G. W. Gibbs pertained to the activities of the individual referred to in the petition in creating a price war, and to the averment that the adoption of the act will give him a monopoly in the milk business in the milk-shed, and to other matters not material to the questions presented for decision. The defendants proved that the election complained of was called upon petition presented to the board and signed by thirty-eight producers, producer-distributors, and distributors.

■ Section 5 of the milk-control act declares: "Upon its organization, the board shall designate natural marketing areas within the State, each of which shall constitute a milk-shed, and the board may, from time to time thereafter, designate additional milk-sheds or combine two or more milk-sheds in which this act is effective. After the designation of any milk-shed and upon petition to the board therefor, the board shall hold an election within such milk-shed to determine whether or not the provisions of this act shall be made applicable within such milk-shed. Each producer, producer-distributor, and distributor having a municipal or county permit to sell milk within the milk-shed shall be entitled to one vote only. If in any such election a majority of the votes cast shall be favorable thereto, the provisions of this act shall thereupon apply within such milk-shed, and shall remain in force throughout the remaining life of this act. The board shall advertise each such election and make reasonable rules governing the conducting thereof. The decision of the board as to the results of any such election shall be final, but the provisions of this act shall not apply

within any part of this State except within any milk-shed wherein a favorable election had been held as provided in this section." The question is whether, under the language of this section, a second election may be had after a first election against adoption of the act. In Supervisors *v.* Galgraith, 99 U. S. 214 (25 L. ed. 410), the following portion of a statute of the State of Mississippi, authorizing a named county to subscribe to the stock of a railroad company, was under consideration: "Provided, however, that an election shall be held in the county for and on account of which stock is proposed to be subscribed by the qualified electors thereof, at the regular precincts of said county, twenty days notice of the time of holding such election, and of the amount proposed to be subscribed; . . and if at said election a majority of the qualified electors voting shall be in favor of such subscription, then said board [of police] shall make such subscription; . . but if a majority of those voting shall be opposed to such subscription, the same shall not be made." In deciding that a second election could be had after a first unfavorable election, the court said: "There is no limitation as to the time when, or the number of times, the voters might be called upon to decide the question of subscription. We can not recognize any restriction as to the latter, in this respect, without adding to the statute what it does not contain. Our duty is to execute the law, not to make it. Such an interpolation would involve the 'judge-made law' which Bentham so earnestly denounces. If authority be needed in support of our construction of the clause, it will be found in The Society &c. *v.* New London, 29 Conn. 174." See also Caldwell *v.* Justices, 57 N. C. 323.

In construing a similar statute of Indiana, providing for authorization of a levy of taxes for financial aid to railroads, which statute prohibited the levy of such tax more than once in two years, and where the machinery was by a petition of and a vote of the people, the Supreme Court of that State, in Bish *v.* Stout, 77 Ind. 255, said: "The limitation is upon the amount the township might appropriate to, or raise by taxation for, railroad purposes within any one period of years, and not upon the number of elections which the board . . may order in the township upon the question of such appropriation within such period of time; and certainly not where it appears, as in this case, that at the only prior

election in the township upon such question, within such period of two years, a majority of the votes cast were against the appropriation." In Cochran v. Edwards, 38 Ark. 136, it was held that where at an election for the removal of a county seat the proposed removal was defeated, a second election could be held; and it was said: "There is nothing in the act which limits the time in which petitions for removal may be repeated; and if public inconvenience and expense may arise from frequent petitions and orders for elections, as submitted by counsel for appellants, the evil must be remedied by legislative amendment of the act. The court must administer the law as it is written." To the same effect see Atherton v. San Mateo County, 48 Cal. 157. However, if the result of the first election is favorable to a proposal, a different result is reached and no second election may be had, in the absence of legislative provision therefor. See Newton v. Ferrill, 98 Ga. 216 (25 S. E. 422). We are of the opinion that section 5 of the act involved in the instant case does not prohibit, but actually contemplates, the holding of other elections in the event of an unfavorable result in the first. The act expressly prohibits the holding of another election if the first is favorable, thereby evidencing an intention on the part of the legislature that in the event the first election be unfavorable another could be had. The expression in the act that the declaration of the result of any such election should be final merely means that there shall be no judicial interference with the declaration of the result as made by the board. It does not mean that another election shall not be had. If such language meant that no other election could be had after the result of the first had been declared, there would have been no necessity for providing that after a favorable election the provisions of the act should thereafter apply to the locality where the favorable election was held.

■ As we construe the attack on the constitutionality of the statute, the sole complaint is that it is invalid because of the classification made as to those to which it applies; that is because it excepts from the provisions thereof those producers not having more than six cows from which such producer is actually selling milk. Section 1 of the act declares: "As a matter of legislative determination, it is hereby declared that milk is a necessary article of food for human consumption; that the production and mainte-

nance of an adequate supply of healthful milk is vital to the public health and welfare; that uneconomic practices in the production, transportation, processing, storage, distribution, and sale of milk within the State of Georgia constitute a constant menace to the health and welfare of the inhabitants of this State, and undermine sanitary regulations and standards of content and purity; that, even with stringent enforcement of sanitary regulations, these uneconomic practices threaten seriously·to impair and ultimately to destroy the supply of wholesome and healthful milk for adults and children within this State; that these facts have created an emergency situation; and that, to preserve the health of the people of this State, it is necessary in this emergency and in the public interest that the distribution and sale thereof be regulated as provided herein." The act then defines consumer, distributing plant, distributor, licensee, milk, milk-shed, producer, producer-distributor, store, etc.; creates a milk-control board, giving them power subject to the provisions of the act "to supervise and regulate the production, transportation, manufacture, storage, distribution, delivery, or sales of milk," and to make rules and regulations, authority to inspect, to issue licenses and classify the licensees; fixes the license fees to be paid, provides for the granting and revoking of licenses upon various grounds, one of which is the failure of the licensee to comply with the sanitary requirements of the town or city in which the licensee is selling milk, or his failure to comply with the health laws of the State; provides for the keeping of various records and making of reports; provides that the fees and licenses collected shall be used for enforcement of the act, and any funds remaining after the expiration of the act in 1941 shall go into the general fund of the treasury of the State; provides various regulations relating to the prices paid for milk from producer to consumer; provides penalties for violation of the act, etc. It is expressly provided that the act shall not be construed to conflict with, to alter, or to repeal any "regulatory sanitary laws regulating the sanitary production and distribution of milk or milk products, or any regulation governing such service now in existence or subsequently adopted or amended as required by law." It is also declared that "The provisions of this act are solely intended to facilitate the orderly marketing of milk."

It is apparent on its face that the act is not one levying a tax,

but is a health measure within the police power, and is therefore not violative of art. 1, sec. 1, par. 2, providing that all taxation shall be uniform upon the same class of subjects. The decision in *Woolworth* v. *Harrison,* 172 *Ga.* 179 (156 S. E. 904), has no application to the instant case. The equal-protection clause of the fourteenth amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. One who assails such law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Lindsley *v.* Natural Carbonic Gas Co., 220 U. S. 61 (31 Sup. Ct. 337, 55 L. ed. 369). Under these rulings, the legislature has the power of making classifications for the purpose of licensing and regulation; and if the purposes of the act do not demand it and the line is not arbitrarily and capriciously drawn, the classification made by the legislature will be upheld if the classification bears a reasonable relation to the purposes of the act. In Noble *v.* Carlton, 36 Fed. (2d) 967, a similar act of Florida containing a similar exemption was upheld. The court held: "A reasonable ground for this exemption will be found in the fact that the owner of five cows or less [six here] would not produce sufficient milk to engage in the production and sale thereof as a business, but might produce more than sufficient to meet his own requirements, and in selling his surplus to his neighbors in the same county could safely do so without the necessity of complying with regulations of persons producing in large quantities for sale at points remote from their domicile. This classification or exemption is not unreasonable, and is therefore not in violation of the fourteenth amendment." See also State *v.* McKinney, 29 Mont. 375 (74 Pac. 1095, 1 Ann. Cas. 579); *Collier* v. *Atlanta,* 178 *Ga.* 575 (173 S. E. 853); *Melnick* v. *Atlanta,* 147 *Ga.* 525 (94 S. E. 1015). We are of the

opinion that the statute does not violate the fourteenth amendment of the constitution of the United States. Upon application of the same principles, the act is not violative, for the reasons given, of art. 7, sec. 2, par. 1, of the constitution of the State of Georgia. The court did not err in refusing to enjoin the election.

*Judgment affirmed. All the Justices concur, except Russell, C. J., and Grice, J., disqualified, and*

HUTCHESON, Justice, dissenting. In the foregoing opinion the writer has merely expressed the views of the majority. His own view is that the first election was final and ended the matter. See *Newton v. Ferrill*, 98 *Ga.* 216 (supra). Being of this opinion, he deems it unnecessary to deal with the constitutional questions raised, and he refrains from any expression thereon.

ON REHEARING.

PER CURIAM. 1. The fact that only four Justices participated in the decision, two being disqualified, and that the disqualifications were unknown until after the decision, does not necessarily and as a matter of law require that the judgment be vacated in order that the places of the disqualified Justices may be filled and the case reheard, the judgment not being void; although such facts might afford discretionary grounds for such action by the court. Since three Justices are satisfied that the decision is correct, and since in these circumstances there is no likelihood that the judgment of affirmance would be changed if the vacancies were filled, the judgment is adhered to so far as this ground is concerned. *Greene County v. Wright*, 127 *Ga.* 150 (56 S. E. 288) ; *Edwards v. State*, 123 *Ga.* 542, 544 (51 S. E. 636) ; Code, § 24-4010; Act approved March 30, 1937, Ga. L. 1937, p. 33.

2. It does not otherwise appear that the judgment should be vacated.

*Judgment adhered to. Atkinson, P. J., Bell and Jenkins, JJ., concur. Hutcheson, J., dissents from note 2. Russell, C. J., and Grice, J., disqualified.*