HARRIS *v.* DUNCAN, Chairman of Milk Control Board.

No. 17548. Submitted September 10, 1951—Decided November 13, 1951—
Rehearing denied November 28, 1951.

*O. B. McElvey* and *Robert Culpepper Jr.*, for plaintiff in error.
*Eugene Cook, Attorney-General, J. R. Parham, Assistant Attorney-General,* and *Frank S. Twitty, Deputy Assistant Attorney-General,* contra.

Atkinson, Presiding Justice. (After stating the foregoing facts.) The act (Ga. L. 1937, p. 247), as amended (Code, Ann. Supp., § 42-523 et seq.), with the emergency feature thereof stricken by the act of 1949, p. 78, is here attacked on the ground that the authority therein to fix the price of milk is in violation of article 1, section 1, paragraph 3 of the State Constitution (Code, Ann., § 2-103), which is the due-process clause, in that it restricts the freedom of contract. This act has three times been before

this court on questions attacking its constitutionality. *Bohannon* v. *Duncan*, 185 *Ga.* 840 (196 S. E. 897); *Gibbs* v. *Milk Control Board of Georgia*, 185 *Ga.* 844 (196 S. E. 791); and *Holcombe* v. *Georgia Milk Producers Confederation*, 188 *Ga.* 358 (3 S. E. 2d, 705). None of these cases is a full-bench decision. Though the *Bohannon* case and the *Holcombe* case each rules that the price-fixing feature of the act is not unconstitutional, yet, not being full-bench decisions, they are not binding authority, and this court can approach the question unfettered by these previous rulings. Neither is this court bound in construing our State Constitution by the rulings of the courts of other States, many of which are based on emergency legislation, or of the United States Supreme Court, which has twice, by divided decisions, upheld the right of a State to authorize the fixing of prices for milk. Nebbia *v.* New York, 291 U. S. 502 (54 Sup. Ct. 505, 78 L. ed. 940, 89 A. L. R. 1469), and Highland Farms Dairy *v.* Agnew, 300 U. S. 608 (57 Sup. Ct. 549, 81 L. ed. 835).

Before the General Assembly can authorize price fixing without violating the due-process clause of our Constitution, among other requirements, it must be done in a business or where property involved is "affected with a public interest," and the milk industry does not come within that scope.

We give credit to the view as taken by Presiding Justice Samuel C. Atkinson in his dissenting opinion in the *Holcombe* case, supra, and recognize "that as a health measure reasonable regulations may be enacted by the legislature, applying to sale and distribution of milk under the police power of the State," but by its provision to fix the price "it thus takes from the seller and purchaser the right to agree upon the price of their choice. . . The right to contract is a property right which is protected by the due-process clauses of our State and Federal constitutions, which can not be abridged by mere legislative act. . . To allow abridgment . . by taking from them the right to agree upon the price, would be to put legislation, whether enacted in exercise of claimed general or police power of the legislature, above the constitution. In this view so much of the act in question as attempts to fix the price . . is void as violative of the due-process clauses of the State and Federal constitutions."

We are also impressed by the sound view expressed by Mr. Justice McReynolds in his dissenting opinion in Nebbia *v.* New York, 291 U. S. 502 (78 L. ed. 940), which was a similar case where a statute of the State of New York providing for the fixing of prices for milk was under review. It is there stated: "Is the milk business so affected with public interest that the Legislature may prescribe prices for sales by stores? This Court has approved the contrary view; has emphatically declared that a State lacks power to fix prices in similar private businesses." And then is cited a long list of cases by the United States Supreme Court. He then quotes from Williams *v.* Standard Oil Co., 278 U. S. 235 (49 Sup. Ct. 115, 73 L. ed. 287, 60 A. L. R. 596), as follows: "It is settled by recent decisions of this Court that a State legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest.' Considered affirmatively, 'it means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been devoted to a public use and its use thereby in effect granted to the public. . . Negatively, it does not mean that a business is affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance'."

While we recognize that the General Assembly was authorized to find that the milk industry was large, milk was a product of virtually universal use throughout the State, that it was perishable, important as a human food, and affected the health of the people, and to further find that it was important to keep an adequate and constant supply at a price fair to both producer and consumer; yet such facts would not qualify the milk industry as being a business "affected with a public interest," notwithstanding the public or the General Assembly would have a feeling of concern in regard to its maintenance. For an industry or any particular business to become "affected with a public interest," its business or its property must be so applied to the public as to authorize the conclusion that it has been devoted to a public use and thereby its use, in effect, granted to the public.

The right to contract, and for the seller and purchaser to

agree upon a price, is a property right protected by the due-process clause of our Constitution, and unless it is a business "affected with a public interest," the General Assembly is without authority to abridge that right.

While we recognize that milk is an essential food and that a constant and sufficient supply is desirable, or even necessary, yet the same may be said of meat and bread. To let down the barriers of our Constitution and take away the right of contract by seller and purchaser as to milk, might well be applied to other food products. Once the constitutional barrier against infringement upon the right of free contract is down, and the gates become open to products because of their universal use by the public and its concern for a constant and adequate supply thereof, other products such as gasoline, oil, tobacco, clothing, and similar articles could well be the subject for price fixing.

As authority to authorize the price-fixing feature of the act in question, it is insisted that the private character of a business does not necessarily remove it from the realm of regulation of prices; and the usury laws, fixing the price which may be exacted for the use of money, are cited therefor; and it is asserted that no business more essentially private in character can be imagined than that of loaning one's personal funds. This analogy runs through some of the decisions upholding the right to fix the price of milk, but we can see no essential resemblance between milk and money. One is a product of an animal and processed for consumption by the efforts of man; the other is a medium of exchange created and produced by the sovereign power, the sole purpose of its creation being that it be applied and devoted to the public for its use, and accordingly it has every indicia of a product affected with a public interest.

We are not unmindful that this act has been in force for some years and many communities have operated under its terms, and that disappointment and the necessity for readjustment will be experienced by some; but any wisdom or expediency of the act must yield to the provisions of the Constitution, the fundamental law of the land, and this court would be recreant to its duty if it failed to set aside an act which encroaches upon the rights of the people reserved to them by the Constitution.

Accordingly, the trial judge erred in overruling the general demurrer.

*Judgment reversed.   All the Justices concur.*

DUCKWORTH, Chief Justice, concurring specially.   The demurrer challenges the provisions of the amended act authorizing the Board to fix prices of milk, upon the grounds that it offends the due-process clause of the Federal Constitution, and that it offends the due-process clause of the State Constitution.   In so far as the Federal question is concerned, we are precluded by the decision in Nebbia *v.* New York, 291 U. S. 502, and would be required to sustain the act as against the attack based upon the Federal Constitution.   However, I think that, in view of the irreconcilable conflict in numerous decisions of the Supreme Court of the United States, considerable light upon the question before us will be gained by referring to a few of those decisions. In the first place, it should be noted that the Nebbia decision has the concurrence of only five Justices, and that the strong dissenting opinion by Mr. Justice McReynolds is concurred in by Justices Van Devanter, Sutherland, and Butler.   In Adkins *v.* Children's Hospital, 261 U. S. 525, 545 (43 Sup. Ct. 394, 67 L. ed. 785, 24 A. L. R. 1238), it was said: "That the right to contract about one's affairs is a part of the liberty of the individual protected by this clause [fifth amendment], is settled by the decisions of this Court and is no longer open to question." Such a positive declaration by that court would appear to have put at rest the question there stated.   Shortly thereafter, in Chas. Wolff Packing Co. *v.* Industrial Court, 262 U. S. 522, 537 (43 Sup. Ct. 630, 67 L. ed. 1103, 27 A. L. R. 1280), it was said: "It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by State regulation."   In the earlier case of Coppage *v.* Kansas, 236 U. S. 1, 14 (35 Sup. Ct. 240, 59 L. ed. 441, L. R. A. 1915 C, 960), that court said: "Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. . . If this right be struck down or arbitrarily interfered with, there is a substantial impair-

ment of liberty in the long-established constitutional sense." Then again in New State Ice Co. *v.* Liebmann, 285 U. S. 262, 277 (52 Sup. Ct. 371, 76 L. ed. 747), an Oklahoma statute, controlling the manufacture, sale, and distribution of ice as a public business was held unconstitutional, and the court said: "It is a business as essentially private in its nature as the business of the grocer, the dairyman, the butcher, the baker, the shoemaker, or the tailor. . . And this court has definitely said that the production or sale of food or clothing cannot be subjected to legislative regulation on the basis of a public use." It should be noted that the quoted language specifies the business of dairyman as one which may not be regulated as to the production and sale of its products. A Tennessee statute fixing the price of gasoline was held unconstitutional in Williams *v.* Standard Oil Co., 278 U. S. 235, 239 (supra) ; and in the opinion that court said, "It is settled by recent decisions of this Court that a State legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest'." Unquestionably the legal principles announced in the foregoing excerpts are irreconcilable with the decision in the Nebbia case, supra. It would therefore have seemed appropriate for the dissenting Justices in the Nebbia case to have spoken as did Justice Frankfurter in his special concurrence in Alabama Public Service Commission *v.* Southern Railway Co. (May 21, 1951), where he said of the majority: "I regret my inability to make clear to the majority of this Court that its decision and the principle underlying it are in flagrant contradiction with the unbroken course of decisions in this Court for seventy-five years." Perhaps the explanation of this conflict is found in Lincoln Union *v.* Northwestern Co., 335 U. S. 525, 536, in the opinion prepared by Mr. Justice Black, where it is said: "This Court beginning at least as early as 1934, when the Nebbia case was decided, has steadily rejected the due-process philosophy enunciated in the Adair-Coppage line of cases. . . Under this constitutional doctrine the due-process clause is no longer to be so broadly construed that the Congress and State legislatures are put in a strait jacket when they attempt to suppress business and industrial

conditions which they regard as offensive to the public welfare." Constitutional guarantees of individual liberty did not change in 1934 or any other year, and so long as they remain in the Constitution their meaning does not change to suit the political philosophy of anyone.

The ground of the demurrer invoking the due-process clause of the State Constitution requires a decision by this court upon that question unhampered by the decisions of the Federal court on the Federal question. This court has heretofore twice ruled upon the question presented, in *Bohannon* v. *Duncan,* 185 *Ga.* 840, and *Holcombe* v. *Georgia Milk Confederation,* 188 *Ga.* 358, both decisions sustaining the act but in each there were dissents. We may put aside as irrelevant here the decision in *Bohannon* v. *Duncan,* supra, as it was expressly based upon the legislative findings of the existence of an emergency, which was in nowise challenged by the complainant. The decision in *Holcombe* v. *Georgia Milk Confederation,* supra, was very largely based upon the decision in the Nebbia case, supra. The opinion states that, when legislation is based upon a finding of fact by the legislature, courts will do no more than determine whether or not the legislative means provided would likely accomplish the ends sought. The legislative finding in the Nebbia case was that there was an over-supply of milk, and the means provided by the act to remedy the evil thus found was to fix a minimum price below which milk could not be sold. To me it is perfectly obvious, as pointed out in the dissenting opinion in that case, that the means thus provided, instead of remedying the evil found, would necessarily aggravate and intensify that evil. The finding here of need for pure and wholesome milk is in no degree met by providing for price-fixing. Thus is demonstrated the unsoundness of the decision in *Holcombe* v. *Georgia Milk Confederation,* supra, since it was based upon the Nebbia case which, when tested by the rule as stated by this court, was an unwarranted exercise of the legislative power. Paragraph 7 of the petition quotes Code (Ann. Supp.) § 42-553, which empowers the Milk Board to fix prices at which milk must be sold. Paragraph (a) of the demurrer challenges the constitutionality of this provision of the law upon the ground that it offends the Constitution (Code, Ann. § 2-103). Thus is the constitutional attack directed to

this specific portion of the act, hence presenting the question for decision without reference to other portions of the act. In *Fleisher* v. *Duncan,* 195 *Ga.* 309 (24 S. E. 2d, 15), paragraph 14 of the petition assailed, not this particular portion of the act, but the act in its entirety upon the grounds that this price-fixing portion was a denial of due process as provided in Code (Ann.) § 2-103. That the attack there was wholly insufficient, since it failed to specify grounds upon which other portions of the act were invalid, is settled beyond doubt by the decisions of this court. See *Miller* v. *Head,* 186 *Ga.* 694 (198 S. E. 680); *Stegall* v. *Southwest Ga. Reg. Housing Authority,* 197 *Ga.* 571 (30 S. E. 2d, 196); *Krasner* v. *Rutledge,* 204 *Ga.* 380 (49 S. E. 2d, 864); *Franklin* v. *Harper,* 205 *Ga.* 779 (2) (55 S. E. 2d, 221). In the case last cited, it was said at page 788, "In this case, an omnibus attack on the act will fail unless the statute is invalid in every part for some reason asserted." Therefore, the constitutionality of the price-fixing provision was not presented for decision in *Fleisher* v. *Duncan,* supra. Furthermore, the opinion there expressly states that, in view of other rulings, it was unnecessary to rule on the constitutional question. That the decision there is wholly irrelevant and inapplicable here is thus plainly demonstrated.

While the petition here asserts that the defendant upon his application therefor had, by the Board, been denied a license to produce and sell milk, yet it further appears from the petition and the demurrer that the license was denied because of the violation of prices fixed pursuant to the act. Therefore, the above ruling means that, in the circumstances pleaded, no right is shown in the petitioner to complain because the defendant had no license. I would assert as my own opinion and for future guidance in the administration of the law that any arbitrary refusal to grant a license would constitute the denial of due process. The fundamental basis upon which my conclusion rests is that the constitutional guarantee of due process would forbid any action that curtails free competition or impairs the value of private property.

The Constitution of this State, by repeated declarations, leaves no room for doubt but that it intends to place around private property the same safeguards with which it shields life and liberty. The following paragraphs of this document in

different terms so declare: Code (Ann. Supp.) § 2-102 (Constitution of 1945; Ga. L. 1945, p. 10) provides that the paramount and highest duty of government is the equal and complete protection of persons and property. The due-process clause (Code, Ann. Supp., § 2-103) declares that no person shall be deprived of "life, liberty, or property" except by due process of law. Code (Ann. Supp.) § 2-301 prohibits government itself from taking or damaging private property for public purposes without first paying therefor. To insure that these constitutional safeguards of life, liberty, and property may never be violated, the Constitution (Code, Ann. Supp., § 2-402; Ga. L. 1945, p. 14) declares all legislation that violates them void and lays upon the judiciary of this State the solemn duty to declare them void. As pointed out by Presiding Justice Atkinson in the dissenting opinion, in which the writer concurred, in *Holcombe* v. *Georgia Milk Confederation,* supra, the legislature has the unquestioned right to provide by law for any reasonable inspection, processing, and sanitary regulations in the production and distribution of milk as a safeguard of the public health, but this is far from an arbitrary legislative attempt to control by law the economic questions attending the ownership and sale of private property by fixing the price thereof. Indeed, to deprive a free citizen of the right to agree upon a price which he will accept for his private property, is to rob him of the most valuable element of that property and to render private ownership a farce.

While it is no legitimate function of the judiciary to advocate or establish any given systems of government, yet it is not inappropriate in this day and age—when the American system of human liberty and free enterprise that has demonstrated its pre-eminent virtue in the growth of the most powerful nation on earth in a relatively short period of time is being assailed from within and from without by the advocates of principles that would render the individual a slave and the government a master —to point to that glorious record as justification for our constitutional system. Courts should not hesitate to act with firmness in the performance of such a high duty. There is no place in this situation for judicial timidity or apology. If this court, in deference to the economic advantages which some may derive from this legislation, should shrink from the performance of its

duty and fail to declare this assault upon individual liberty unconstitutional because the legislature has recited that milk is an important and essential food, a precedent would thereby be set requiring this court to sustain legislation fixing the price of all products vital to human life and health, yes, including medical services which most vitally affect the life and health of the people of the State. By such conduct the legislature, aided and abetted by the judiciary of this State, could ultimately convert Georgia into a socialistic State despite the plain provisions of the Constitution which forbid such. For these reasons as well as those stated in the opinion, I concur in the judgment of reversal.